## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED GENERAL )
CONTRACTORS OF AMERICA, INC. )
2300 Wilson Blvd., Suite 300 )
Arlington, VA 22201, )     **No. 1:20-cv-03567-BAH**
 )
            Plaintiff )     FIRST AMENDED
 )     COMPLAINT FOR
            v. )     DECLARATORY AND
 )     INJUNCTIVE RELIEF
UNITED STATES SMALL )
BUSINESS ADMINISTRATION )
409 3rd St SW, Washington, DC 20416, )
 )
UNITED STATES OFFICE OF )
MANAGEMENT AND BUDGET )
725 17th Street, NW Washington, DC 20503, )
 )
            Defendants. )

## NATURE OF THE CASE

1.    The Associated General Contractors of America, Inc. ("AGC") brings this action for declaratory and injunctive relief against the United States Small Business Administration ("SBA") and the United States Office of Management and Budget ("OMB") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, the Paperwork Reduction Act of 1995 ("PRA"), 44 U.S.C. chapter 35, and the Fifth Amendment to the U.S. Constitution.

2.    In March 2020, as the COVID-19 pandemic flung the United States, and the world, into tumult, Congress passed, and the President signed, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "Act"), Pub. L. 116-136. Among the many provisions in the CARES Act's $2 trillion stimulus package was the Paycheck Protection Program, commonly referred to as the PPP. Under the PPP, the federal government, acting through SBA, fully guaranteed relief loans for eligible small businesses, individuals, and nonprofit

organizations that would be forgiven if loan proceeds were used as required under the Act. Businesses could use the PPP loans to pay for certain eligible expenses, including business costs, payroll costs, employee benefits and leave, mortgage interest payments, debt refinancing, rent, and utilities.

3.      The SBA required all applicants for PPP loans to certify in good faith, and *at the time they applied for such a loan,* that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

4.      This lawsuit concerns the manner by which SBA is now making its forgiveness determinations and even second-guessing borrower eligibility for PPP loans in the first place. SBA recently introduced into circulation its so-called "Loan Necessity Questionnaire" ("Questionnaire") aimed at PPP loan borrowers. SBA will use borrowers' responses to that questionnaire to determine whether the borrowers are eligible for loan forgiveness and, indeed, whether they were even eligible for their loans in the first instance.

5.      As explained in greater detail below, the Questionnaire, one version of which applies to for-profit companies and a second version of which applies to non-profit companies, asks borrowers to support the certifications they made back in the spring about the need for loan relief due to economic uncertainty. But while the Questionnaire purports that "SBA's determination [about the borrower's good-faith certification that economic uncertainty made the loan request necessary] will be based on the totality of your circumstances," the borrower's actual ability to provide sufficient context to demonstrate the totality of its circumstances is circumscribed. Most notably, the Questionnaire does *not* ask borrowers to describe the status of their operations and the attendant business anxieties that they were experiencing *at that time*. Instead, the Questionnaire probes deeply into *what came after*, over the ensuing months of 2020,

seeking information about the borrower's business success (or failure). Among other things, the Questionnaire asks for a comparison of second quarter revenue in 2020 to the borrower's second quarter revenue in 2019 (if the company was then in existence), and about current bank statements and other information about current liquidity.

6.     In short, although SBA purports (as contemplated by the CARES Act) to be interested in evaluating the borrower's certification made back in the spring amidst great uncertainty and tumult, the Questionnaire focuses exclusively on later events. This contradiction is deeply troubling to many borrowers because their success or failure over the balance of 2020 could not possibly have been knowable in those early days of the pandemic when the economy was headed into a tailspin. As is now generally known, with the benefit of hindsight, the pandemic affected different businesses in different ways—some businesses, such as in the travel and hospitality industry, have suffered great losses, and many have gone out of business. Others, though, fared better or even saw year-over-year economic improvement because the nature of their work. Throughout the pandemic, the federal government has consistently considered most, if not all, of the construction industry to be essential, and a majority of state and local governments have followed suit. And, since April, some project owners have actually decided to accelerate the construction of their projects, hoping to take advantage, for example, of the decrease in highway traffic volume. This does not mean that the construction industry is anywhere close to being out of the woods. In the wake of the last recession, total spending on nonresidential construction continued to drop over the 28 months from October of 2008 to February of 2011, and during that period, it dropped a total of 29%. Employment in nonresidential construction similarly continued to decline over the 24 months from February of 2008 to February of 2010, and during that period it dropped a total of 23%. As the pandemic

arrived and then grew, no one knew whether, or where, the construction industry would experience a short-term increase in work. Such increases were uncertain at best, and vulnerable to changes in the course of the pandemic. And today, the threat to the ongoing operations of the vast majority of non-residential construction contractors remains very far from over. For the most part, the Questionnaire (and SBA's online portal for submitting the answers) is a "Yes/No" exercise that does not grant borrowers an opportunity to present the totality of their circumstances. Borrows are not afforded a meaningful opportunity to provide any broader, and objectively helpful, context for their answers.

7.      Worse, SBA intentionally hid, and is still hiding, the Questionnaire from public view, even after SBA released the form into circulation for use. Ostensibly, SBA obtained the approval of OMB to release the Questionnaire into circulation, but, as explained below, the process followed by the two defendant agencies did not adhere to what is required under the PRA. On October 26, 2020, as required by the PRA, SBA published in the Federal Register, and invited a 30-day public comment on, an information collection request that included among its topics the Questionnaire here at issue. Although the whole point of the PRA is to give the affected public the opportunity to comment on the burden an agency estimates any given information collection will have, the Questionnaire itself was not attached to SBA's notice. On the contrary, SBA told OMB that it did not want to make the Questionnaire available for public review because it feared borrowers would change their business practices to suit what they thought SBA wanted to see from them if they knew in advance the questions SBA intended to ask.

8.      Through this action, AGC is challenging the legality of the Questionnaire and the legal adequacy of the process undertaken by both SBA and OMB in developing, approving, and

publishing the Questionnaire for use. For relief, AGC respectfully asks the Court to declare that the Questionnaire was developed and published through an unlawful process and that the questions included therein are arbitrary and capricious, and further, that SBA's use of the Questionnaire for evaluating borrower eligibility for both a PPP loan and subsequent loan forgiveness denies PPP borrowers due process; to enjoin SBA from denying an application for PPP loan forgiveness, or otherwise challenging a borrower's certification that economic uncertainty made the request necessary to support ongoing operations, solely or exclusively on the information that a borrower provides to SBA in response to the Questionnaire and in the absence of a finding that the borrower did not act in good faith at the time the certification was made; and to order SBA to make the Questionnaire available for public comment for at least 60 days, and then to adopt, subject to OMB approval, a revised questionnaire for prospective use in evaluating PPP loan forgiveness eligibility, following SBA's consideration of the comments received and its incorporation of any new language based on those comments.

## JURISDICTION AND VENUE

9.     The Questionnaire constitutes final agency action for purposes of the APA. For one thing, the Questionnaire is already in circulation and borrowers have been directed to respond within ten business days, so the form is operative and clearly represents the consummation of SBA's decision-making process with respect to the questions SBA intends to ask PPP loan borrowers to determine their eligibility for loan forgiveness, *inter alia*. And, the Questionnaire has obvious legal consequences for PPP loan borrowers: the entire purpose of the Questionnaire is to facilitate SBA's assessment of whether a borrower is legally eligible to have received its PPP loan or have its PPP loan forgiven and, therefore, whether it is legally obligated to repay its loan.

10.     OMB's approval of an agency's proposed "collection of information" under the PRA also constitutes final agency action for purposes of the APA. *See* 44 U.S.C. §§ 3502(3), 3507.

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case presents questions arising under federal laws and the U.S. Constitution.

12.     AGC has standing because the Questionnaire directly affects the interests of its many members who applied for and obtained PPP loans. The protection of its members from the burdens and harms imposed or caused by the Questionnaire is within the heartland of AGC's mission and purpose, and no facts specific to any individual member need be decided that would otherwise necessitate the participation of that individual member company as a plaintiff in this lawsuit.

13.     Through the APA, the United States has waived sovereign immunity from this lawsuit.

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because SBA and OMB reside in this judicial district, and the actions that are the subject of this Complaint were taken, at least in material part, in this district.

## PARTIES

15.     AGC is the leading trade association in the construction industry. AGC represents more than 27,000 firms of all sizes. These firms include more than 6,500 of America's leading general contractors and over 9,000 specialty-contracting firms, from Puerto Rico to Hawaii. AGC is incorporated in Washington, D.C. and has served the construction industry since 1918. These members construct public and private buildings, including offices and apartment buildings, hospitals, laboratories, schools, shopping centers, factories and warehouses. AGC members also construct public and private infrastructure, such as highways, bridges, tunnels,

dams, airports, industrial plants, pipelines, power lines, and both clean and wastewater facilities. For statistical purposes, some of these projects are considered residential, but it remains extremely rare for AGC members to engage in the construction of single-family homes. It is equally rare for AGC members to be publicly traded on the stock exchanges. An overwhelming majority are closely held. AGC's core functions include providing information about the industry and the federal policies that bear on the industry to its members and the public and promoting better relations between public bodies and construction contractors.

16.     SBA is an independent federal agency of the United States Government, established in 1953, and dedicated to small businesses concerns. SBA's stated mission is to aid, counsel, assist, and protect the interests of small businesses, to preserve free competitive enterprise, and to maintain and strengthen the overall economy of our nation. Its headquarters are in Washington, D.C.

17.     OMB is a federal agency of the United States Government. It is a component of the Executive Office of the President, and is headquartered in Washington, D.C. Among its functions, OMB administers the PRA.

## BACKGROUND

**I.      Responding to the Economic Impact of the Pandemic, the Federal Government Establishes the CARES Act and the Paycheck Protection Program.**

18.     On March 27, 2020, President Trump signed the CARES Act into law. Pub. L. 116-136. The CARES Act provided for an expansive, $2 trillion stimulus package, including direct relief to individuals in the form of one-time cash payments, funding for the healthcare industry, and various forms of assistance for small and other businesses impacted by the coronavirus outbreak.

19.     The CARES Act established the Paycheck Protection Program, or PPP, which was intended to provide expeditious relief to small businesses and other eligible entities. Congress initially appropriated $349 billion for the PPP. The PPP is implemented by SBA, with support from the Department of the Treasury ("Treasury").

20.     The PPP was viewed as a lifeline to shore up small businesses in the face of a worsening pandemic and an economy on the brink of countrywide lockdowns and massive uncertainty.[1] As the Treasury and SBA declared in a joint statement, "The Program will provide much-needed relief to millions of small businesses so they can sustain their businesses and keep their workers employed . . . Speed is the operative word . . . We remain committed to supporting our nation's more than 30 million small businesses and their employees, so that they can continue to be the fuel for our nation's economic engine."[2]

21.     Under the PPP, the federal government, acting through SBA, provided eligible small businesses, individuals, and nonprofit organizations with relief funds in the form of loans that would be fully forgiven if they were used as required under the Act. Entities could spend PPP loans on certain eligible expenses, including urgent business costs, such as payroll costs, employee benefits and leave, mortgage interest payments, debt refinancing, rent, and utilities.

---

[1] Ryan Guina, "Small Business Owner? This Forgivable Loan May Help Keep Your Business Afloat During The Lockdown," Forbes, Apr 1, 2020,11:26 am, https://www.forbes.com/sites/ryanguina/2020/04/01/paycheck-protection-program-small-business-loan/?sh=4edfc83977a3; Aaron Gregg, How to get a small-business loan under the new $484 billion coronavirus aid package, Washington Post, Apr. 28, 2020, https://www.washingtonpost.com/business/2020/04/22/small-business-loan-faq/; see also Emily Flitter, "Small Business Aid Program Stretches Agency to Its Limits," New York Times, April 7, 2020, https://www.nytimes.com/2020/04/07/business/coronavirus-ppp-small-business-aid.html.

[2] Press Release, "With $349 Billion in Emergency Small Business Capital Cleared, Treasury and SBA Begin Unprecedented Public-Private Mobilization Effort to Distribute Funds," Department of the Treasury (March 31, 2020).

22.      The prerequisites to PPP loan eligibility include several certifications. Among the relevant provisions of the CARES Act is Pub. L. 116-136, § 1102(a) (codified at 15 U.S.C. § 636(a)(36)(G)(i)(I)), which states that "An eligible recipient applying for a covered loan shall make a good faith certification—(I) that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient."

23.      The CARES Act established the PPP by amending Section 7(a) of the Small Business Act, 15 U.S.C. § 636(a). In doing so, the CARES Act also waived the application of the SBA 7(a) loan program requirements related to personal guarantees and inability to obtain credit elsewhere, which AGC member companies understood at the time to mean that borrowers did not have to exhaust all resources or tap into personal finances before applying for a PPP loan:

> (I) CREDIT ELSEWHERE.—During the covered period, the requirement that a small business concern is unable to obtain credit elsewhere, as defined in section 3(h), shall not apply to a covered loan.

> (J) WAIVER OF PERSONAL GUARANTEE REQUIREMENT. —During the covered period, with respect to a covered loan—

> (i) no personal guarantee shall be required for the covered loan; and

> (ii) no collateral shall be required for the covered loan.

15 U.S.C. § 636(a)(36).

## II.      SBA and the Treasury Department Rushed the Rollout of the PPP.

24.      Immediately following passage of the CARES Act, the Secretary of the Treasury indicated that the PPP application period would open as early as April 3, 2020, notwithstanding that the CARES Act failed to answer fundamental questions regarding eligibility, and that neither Treasury nor SBA had issued any guidance.

25.      As a result of the chaotic circumstances of the rollout, businesses and lenders were left scrambling to understand the rules underlying loan eligibility, how to apply, and key

loan terms. The situation was made only more disorderly by the fact that the SBA disaster loan application portal was shut down for days after the names of approximately 100 loan applicants were exposed as a result of a data breach.[3]

26.     On March 31, 2020, Treasury released a draft PPP application, which was unclear in key respects as to eligibility for loans and calculation of loan amounts. At the time, it remained unclear whether existing SBA affiliation rules would be modified, which impacted whether small businesses owned or controlled by private equity funds, or otherwise affiliated with large businesses through their corporate relationships, were eligible to participate.

27.     On April 3, 2020, the PPP application period opened for businesses, including sole proprietorships, and non-profit entities.[4] The PPP application period did not open to "independent contractors and self-employed individuals" until April 10, 2020. *Id*.

28.     Early on April 3, 2020, the same day the PPP application period opened, SBA released the final PPP loan application form (SBA Form 2483), and Treasury posted a pre-publication copy of an interim final rule implementing Sections 1102 and 1106 of the CARES Act. That interim final rule provided additional guidance concerning the forgiveness and loan review processes for PPP loans of $50,000 or less and, for PPP loans of all sizes, lender responsibilities with respect to the review of borrower documentation of eligible costs for forgiveness in excess of a borrower's PPP loan amount. The interim final rule also announced that the PPP loan proceeds would be available on a ''first-come, first-served" basis.

---

[3] James T. Madore, "SBA reopens online applications for disaster loans, Newsday, Mar. 30, 2020, https://www.newsday.com/business/sba-disaster-loan-web-portal-1.43543151.

[4] *See* Small Business Paycheck Protection Program, Department of Treasury Guidance, https://home.treasury.gov/system/files/136/PPP%20--%20Overview.pdf.

29.     The day after the PPP application period opened, April 4, 2020, SBA released a second interim final rule and associated guidance, addressing such basic eligibility questions as which affiliation test and exemptions would apply.

30.     Even though lenders were flooded with PPP applications from the outset, SBA cautioned in yet another interim final rule published on April 15, 2020 that additional guidance was forthcoming on such essential issues as loan forgiveness, advance purchase for loans sold in the secondary market, and religious liberty protections under the PPP. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01 (Apr. 15, 2020).

## III.     COVID-19 Threw the Country, and the Construction Industry, into Tumult.

31.     By early-mid April, COVID-19 was having a dramatic impact on the global and domestic economies. The International Monetary Fund released a report stating that "the global economy is projected to contract sharply by –3 percent in 2020, ***much worse than during the 2008–09 financial crisis***."[5]

32.     Within the construction industry, construction employment declined by 975,000 jobs in April 2020, causing the unemployment rate within the industry to rise from 4.7% in April 2019 to 16.6% in April 2020.[6]

33.     On April 8, 2020, the American Association of State Highway and Transportation Officials (AASHTO) made "an urgent request" of Congress "for $50 Billion in direct emergency

---

[5] *World Economic Outlook, April 2020: The Great Lockdown*, International Monetary Fund, April 14, 2020.

[6] Construction Industry Loses 975,000 Jobs In April As New Association Survey Shows Deteriorating Demand For Construction Projects, AGC Newsroom, https://www.agc.org/news/2020/05/08/construction-industry-loses-975000-jobs-april-new-association-survey-shows.

assistance," explaining that its "[p]reliminary projections from state DOTs show at least a 30 percent decline in transportation revenue on average for the next 18 months."[7]

34.     The Architectural Building Index[8] is a widely watched indicator of future demand for non-residential construction, with a lead time of approximately 9-12 months. The American Institute of Architects derives the index from its "Work-on-the-Boards" survey on shifts in billings from architectural firm leaders. For any one month, a score that exceeds 50 indicates that architectural billings increased over the preceding month and a score of falls below 50 indicates that such billings dropped. In March of 2020, the index dropped to 33.3 and in April, it dropped again, to 29.5.

35.     In addition, the pandemic caused more than one out of four contractors to halt or delay work on current projects.[9] In late March, contractors listed numerous types of delays and shortages: nearly 18% cited shortages of required government actions or personnel, for instance to issue permits or certificates of occupancy, conduct inspections or lettings, or make project awards; 16% noted a shortage of materials, parts or equipment, including workers' personal protective equipment such as respirators; and 11% reported a shortage of craft workers as individuals self-quarantine or stay home to care for others. *Id.*

---

7 American Association of State Highway and Transportation Officials, *AASHTO Asks Congress for $50 Billion In Coivid-19 Relief Aid for State DOTs*, April 8, 2020, http://aashtonews.wpengine.com/2020/04/08/aashto-asks-congress-for-50-billion-in-covid-19-relief-aid-for-state-dots/.

8 *See* https://www.aia.org/resources/10046-architecture-billings-index-abi.

9 Press Release, Associated General Contractors of America, Pandemic Has Halted or Delayed Projects For 28 Percent of Contractors, Survey Finds; New Senate Relief Bill Will Provide Some Help For Industry (Mar. 20, 2020).

36.     The situation within the construction industry worsened by the week. On April 3, 2020, 27% of construction firms were reporting layoffs.[10] At that point, up to 59% of contractors were reporting disruption and delays with ongoing projects. *Id*. Just a week later, on April 10, 40% of construction firms were reporting layoffs.[11] It is no wonder that a survey of construction firms in early April showed that almost 75% of construction firms intended to seek PPP loans. *Id*.

## IV.     First Come, First Served: the PPP Rollout Causes an Applicant Scramble for Limited Funds.

37.     Despite Treasury's and SBA's stated intent to provide immediate relief to millions of small businesses through the PPP, PPP loans would not be available for all. Instead, PPP loans would be provided on a first-come, first-served basis. Adding to the chaos was the fact that some banks prioritized existing customers, which left some small businesses scrambling to find a lender.[12] In addition, some banks approached the initial tranche of loans with a two-tier system, favoring the applications of professional firms, while deprioritizing smaller businesses and individuals.[13]

---

[10] Press Release, Associated General Contractors of America, Twenty-Seven Percent of Construction Firms Report Layoffs Since the Coronavirus As New Jobs Report Offers Early Snapshot of the Losses (Apr. 3, 2020).

[11] Press Release, Associated General Contractors of America, Forty Percent of Construction Firms Report Layoffs Amid Widespread Cancellations as Economic Impact of Corona Virus Grows (Apr. 10, 2020).

[12] Jeff Blumenthal, "SBA PPP loan applicants search for Plan B as banks prioritize existing customers," Philadelphia Business Journal (Apr. 7, 2020), https://www.bizjournals.com/philadelphia/news/2020/04/07/sba-ppp-loan-applicants-search-for-plan-b-as-banks.html.

[13] Emily Flitter, "Banks Gave Richest Clients 'Concierge Treatment' for Pandemic Aid," New York Times, Apr. 22, 2020, https://www.nytimes.com/2020/04/22/business/sba-loans-ppp-coronavirus.html.

38.     Demand for PPP loans was widely expected to exceed the initial $349 billion appropriation. Indeed, in the days leading up to the application opening, SBA indicated publicly that it expected the loan program to be oversubscribed.[14]

39.     No one knew whether or when Congress would appropriate more funds to the PPP once the initial funding ran out.

40.     Despite SBA's failure to address basic ground rules of the program, small businesses flooded lenders with PPP applications starting on April 3, 2020. *See, e.g.,* Rhonda Abrams, "PPP loan plan a mess so far for small businesses riding out coronavirus crisis," USA Today,       updated       Apr.       8,       2020,       11:09       am https://www.usatoday.com/story/money/usaandmain/2020/04/07/ppp-loan-plan-rollout-disaster-small-businesses/2963901001/ ("By Monday morning, Wells Fargo stopped accepting applications altogether, saying they'd reached their financial limit. Bank of America had received over $32 billion in applications.").

41.     The initial loan application process was a chaotic stampede.  According to the U.S. Government Accountability Office (GAO), "[m]ost of the loans over $2 million (75 percent) were made during the first few weeks of the program, and about 85 percent of all PPP loans were made during the program's first two months."[15]

42.     On April 16, 2020, within two weeks of the launch of the PPP program, initial funding was "exhausted" due to the high volume of applicants.[16] Approved loans generally went

---

[14] *See* Ryan Guina, "Small Business Owners Frustrated With Troubled Paycheck Protection Program       Launch,"       Forbes,       April       4,       2020, https://www.forbes.com/sites/ryanguina/2020/04/04/small-business-owners-frustrated-with-failed-paycheck-protection-program-launch/?sh=a899cf365009.

[15] U.S. Gov't Accountability Off., GAO-21-117T, Small Business Administration: COVID-19 Loans Lack Controls and Are Susceptible to Fraud (2020).
[16] *Id.*

to larger borrowers: "92% of PPP loans of $2 million and more received approval by the end of April, whereas just 54% of loans $350,000 or less received approval by then."[17]

## V.    SBA Provided Limited, and Confusing, Guidance on PPP Loan Eligibility.

43.    Consistent with the CARES Act, SBA Form 2483 (*Paycheck Protection Program Application Form*) required each PPP borrower to certify that "[c]urrent economic uncertainty makes this loan request necessary to support ongoing operations of the Applicant." None of SBA's initial interim final rules or FAQs addressed the meaning of this certification.

44.    It was not until April 23, 2020—nearly three weeks after making the loan application form available and one week after the initial $349 billion PPP funds were tapped out—that SBA and Treasury began shedding light on the vague certification requirement in Form 2483 by updating the PPP Frequently Asked Questions ("FAQ") document.[18] Among the questions (#31) was, "Do businesses owned by large companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?"

45.    In response, Treasury stated, "In addition to reviewing applicable affiliation rules to determine eligibility, all borrowers must assess their economic need for a PPP loan under the standard established by the CARES Act and the PPP regulations at the time of the loan application . . . . [B]orrowers still must certify in good faith that their PPP loan request is necessary."

46.    Further, SBA and Treasury announced that "[b]orrowers must make this certification in good faith, taking into account their **current business activity** and their **ability to**

---

[17] Yuka Hayashi, "PPP Money Abounded—but Some Got It Faster Than Others," Wall Street Journal, Oct. 6, 2020, https://www.wsj.com/articles/ppp-money-aboundedbut-some-got-it-faster-than-others-11601976601.

[18] https://www.sba.gov/sites/default/files/2020-04/Paycheck-Protection-Program-Frequently-Asked-Questions_04%2026%2020.pdf.

**access other sources of liquidity sufficient** to support their ongoing operations in a manner that is not significantly detrimental to the business." *Id*. (emphasis added).

47.     Regarding public companies, the FAQ stated that "it is unlikely that a public company with substantial market value and access to capital markets will be able to make the required certification in good faith." *Id*.

48.     SBA and Treasury plainly recognized the game-changing impact if these newly announced interpretations would retroactively apply to all companies that previously applied for and received PPP loans, so they introduced a safe harbor period: "Any borrower that applied for a PPP loan prior to the issuance of this guidance and repays the loan in full by May 7, 2020 will be deemed by SBA to have made the required certification in good faith." *Id*.

49.     This apparent retroactive application is underscored by the warning that PPP loan recipients must "be prepared to demonstrate to SBA, upon request, the basis for its certification" that the PPP loan was "necessary to support the ongoing operations of the Applicant."

50.     Importantly, FAQ #31 provided that any borrower that cannot defend making this certification in light of its new guidance should repay the PPP loan in full by May 7, 2020 under the safe harbor provision.

51.     On April 24, 2020, Congress appropriated an additional $310 billion for the PPP as part of the Paycheck Protection Program and Health Care Enhancement Act. Pub. L. 116-139. This enhancement was silent with regard to the "economic uncertainty" certification. *Id*.

52.     On April 28, 2020, another FAQ (#37) asked, "Do businesses owned by private companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?" The response to this question referred back to the response to question FAQ #31.

53.     Finally, on May 13, 2020, FAQ #46 asked, "How will SBA review borrowers'
required good-faith certification concerning the necessity of their loan request?" SBA and
Treasury responded that any borrower that, together with its affiliates, received a PPP loan with
an original principal amount of less than $2 million fell into a safe harbor and would be deemed
to have made the certification in good faith.

54.     For borrowers with loans greater than $2 million, however, SBA said that if it
determined in the course of its review that a borrower lacked an adequate basis for the required
certification concerning the necessity of the loan request, SBA would seek repayment of the
outstanding PPP loan balance and would inform the lender that the borrower is not eligible for
loan forgiveness.

55.     SBA's Response to Question #46 indicated, however, that even a borrower that
did not fall under the broader safe harbor requirements might still have an "adequate basis" for
making the good-faith certification based on their individual circumstances. If the borrower
repaid the loan after receiving notification from SBA, SBA said that it would not pursue
administrative enforcement or referrals to other agencies based on its determination with respect
to the certification concerning necessity of the loan request.

**VI.     The PPP Loan Application Process Was Rife with Confusion and Uncertainty.**

56.     As of May 31, 2020, SBA reported that more than 170,000 PPP loans totaling
about $38.5 billion had been cancelled,[19] demonstrating that many borrowers reversed course
given the *post-hoc* guidance and the confusion and panic that it engendered.

57.     On June 1, 2020, via an interim final rule, SBA provided borrowers with positive
assurance via the Federal Register that it would base any later assessment on a borrower's

---

[19] U.S. Gov't Accountability Off., GAO-20-625, COVID-19: Opportunities to Improve Federal
Response and Recovery Efforts (June 25, 2020).

eligibility for a PPP loan "on the provisions of the CARES Act, SBA rules or guidance available at the time of the borrower's loan application." Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Loan Forgiveness, 85 Fed. Reg. 33004, 3305 (June 1, 2020) (to be codified at 13 C.F.R. Part 120). This was consistent with PPP FAQ #17, published on April 8: "Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application."

58.     On June 25, 2020, GAO released a report to Congress entitled "COVID-19: Opportunities to Improve Federal Response and Recovery Efforts."[20] The report found that the rapid rollout of the PPP program "contributed to confusion and questions about the program and raised program integrity concerns." *Id*.

59.     The GAO report laid out the rocky timeline of the PPP program, demonstrating the administrative and procedural whitewater that borrowers faced in submitting their loan applications:



60.     GAO noted that "clearer explanations of the good faith necessity certification in SBA's initial interim final rule for PPP could have helped avoid uncertainty concerning loan eligibility." GAO recognized that time was of the essence and that SBA acted fast to "help

---

[20] *Id.*

quickly disperse funds," but it ultimately concluded that, while "SBA's initial interim final rule allowed lenders to rely on borrower certifications to determine the borrower's eligibility. . . the rule provided minimal additional information to borrowers on the required good faith necessity certifications."

61.     GAO recommended that SBA develop and implement plans to identify and respond to risks in the PPP program to ensure program integrity, achieve program effectiveness, and address potential fraud.

62.     On August 8, 2020, the PPP application process closed with $130 billion unused.[21]

63.     Attention turned at that point to loan forgiveness. On August 4 and August 11, 2020, SBA issued FAQs on loan forgiveness. On August 10, 2020, the PPP loan forgiveness platform began accepting applications.

## VII.   SBA and OMB Sidestep the Paperwork Reduction Act and Roll Out the Loan Necessity Questionnaire in Secret.

64.     Since the release of FAQ #46 in May, SBA has repeatedly noted that it was considering how it would review loans of $2 million or more. GAO's June 25, 2020 Report noted that, "[w]hile SBA planned to review loans of more than $2 million, as of June 15, 2020, it had not provided details on how it planned to carry out that work."[22] To the extent SBA intended to carry out that work by collecting additional information from borrowers, it was of course required to follow the PRA.

---

[21] *See* https://www.cnn.com/2020/06/30/politics/paycheck-protection-program-extension-passes-senate/.

[22] U.S. Gov't Accountability Off., GAO-20-625, COVID-19: Opportunities to Improve Federal Response and Recovery Efforts (June 25, 2020).

65.     The PRA requires that OMB approve any collections of information from the public by a federal agency before the information collection can be implemented. *See* 44 C.F.R. chapter 35; 5 C.F.R. Part 1320. A federal agency seeking OMB approval to collect information must first evaluate the plan for a proposed information collection, including the need for the information and the burden imposed by collection. 44 U.S.C. § 3506(c)(1)(A).

66.     Subject to limited exceptions, an agency generally must "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information." 44 U.S.C. § 3506(c)(2); 5 C.F.R. § 1320.8(d). In addition, OMB generally must "provide at least 30 days for public comment prior to making any decision" to approve or disapprove an agency's "proposed collection of information not contained in a proposed rule." 44 U.S.C. §§ 3507(b), (c); 5 C.F.R. § 1320.10.

67.     An agency may request that OMB approve the collection of information "without compliance with the provisions of this subchapter for a maximum of 180 days after the date on which [OMB] received the request to authorize such collection" if the agency determines that "a collection of information is needed prior to the expiration of time periods established under this subchapter; and is essential to the mission of the agency; and the agency cannot reasonably comply with the provisions of this subchapter because (i) public harm is reasonably likely to result if normal clearance procedures are followed; (ii) an unanticipated event has occurred; or (iii) the use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information or is reasonably likely to cause a statutory or court ordered deadline to be missed." 44 U.S.C. § 3507(j); 5 C.F.R. § 1320.13.

68.     Following OMB approval, "[a]n agency may not make a substantive or material modification to a collection of information . . . unless the modification has been submitted to [OMB] for review and approval[.]" 44 U.S.C. § 3507(h)(3).

69.     On March 30, 2020, SBA requested that OMB exercise its authority under 44 U.S.C. § 3507(j) and 5 C.F.R. § 1320.13 to approve, on an emergency basis, SBA's information collection request related to implementation of the CARES Act's PPP and to waive the PRA's 60-day public comment notice requirement.

70.     OMB approved SBA's emergency review request on or around March 31, 2020, assigning it OMB Control Number 3245-0407. The information collection initially consisted of SBA Form 2483 (*Paycheck Protection Program Application Form*) and SBA Form 2484 (*Paycheck Protection Program Lender's Application for 7(a) Guaranty*). By statute, OMB's emergency approval was mandated to expire no later than September 26, 2020. Yet from the time of its initial approval, OMB proclaimed, without explanation, that its emergency approval would expire on October 31, 2020. Since OMB's emergency approval, SBA has requested, and OMB has approved, nearly a dozen requests to change SBA's information collection request.[23] In each request, SBA stated it was updating forms or expanding the information collection to include additional forms. In each approval, OMB accepted SBA's characterization of the change as "no material or nonsubstantive change to a currently approved collection," and OMB reiterated its belief that the emergency approval was valid for a period of longer than 180 days, *i.e.*, until October 31, 2020.

71.     SBA also published a 60-day notice and request for comment for this information collection request on July 14, 2020. Data Collection Available for Public Comments, 85 Fed.

---

[23] https://www.reginfo.gov/public/do/PRAOMBHistory?ombControlNumber=3245-0407.

Reg. 42,479 ("July Notice"). The July Notice states that OMB's emergency approval "will expire on October 30, 2020,"[24] without acknowledging the 180-day limit in the PRA, 44 U.S.C. § 3507(j). Because SBA's Questionnaire (Forms 3509 and 3510) apparently did not exist at the time, the July Notice makes no mention of it.

72.    As of October 1, 2020, SBA's Office of Inspector General reported that agency management could not share details of loan review and forgiveness processes as they had not been finalized.[25] Beginning in October 2020, without warning, SBA used its prior OMB emergency authorization to announce its intent to require borrowers to justify their good-faith economic uncertainty certifications. On or around October 22, 2020, SBA obtained OMB's approval to add Form 3509 (*Loan Necessity Questionnaire (For-Profit Borrowers*)) and Form 3510 (*Loan Necessity Questionnaire (Non-Profit Borrowers*)) to OMB Control Number 3245-0407. OMB once again accepted SBA's characterization that this was another "no material or nonsubstantive change to a currently approved collection." Neither SBA nor OMB made either of these forms available to the public at that time.

73.    On October 1, GAO released testimony before Congress describing GAO's review of SBA's plans, and prior actions, to audit PPP loans for fraud.[26]  GAO noted that its requests to SBA for information regarding SBA's plans for loan enforcement had been rebuffed: "As of our September 2020 report, SBA was working with Treasury and contractors to finalize plans to review loans of less than $2 million. We have asked for additional details on SBA's loan reviews, but SBA has not yet provided this information. We will continue to seek details on

---

[24] AGC assumes the reference to October 30 instead of October 31 was a clerical error.

[25] U.S. Small Business Administration Office of Inspector General, Top Management and Performance Challenges Facing the Small Business Administration in Fiscal Year 2021 (Oct. 16, 2020).

[26] U.S. Gov't Accountability Off., GAO-21-117T, Small Business Administration: COVID-19 Loans Lack Controls and Are Susceptible to Fraud (2020).

SBA's ongoing oversight of PPP." *Id*. at 10. There is no reference in the GAO testimony about SBA Forms 3509 or 3510, nor is there any indication that SBA had yet made GAO aware of its intended use of those forms. *See id*.

74.     In an October 14, 2020 interview, Bill Shear, the Director of GAO's Financial Markets and Community Investment team stated that SBA failed to provide "documented evidence, as far as what actions have been put in place" regarding PPP administration oversight.[27] SBA told GAO that it was hiring contractors to audit loans over $2 million, but that the contractors would not review "economic necessity certification." *Id*.

75.     Meanwhile, it is now apparent, SBA was pushing Forms 3509 and 3510 through OMB. SBA's PRA Submission Justification explained that SBA intended to ask borrowers receiving a loan of $2 million or greater to submit information substantiating the borrower's certification that economic uncertainty made the loan necessary:

> During SBA's loan review process, borrowers, that together with their affiliates, received PPP loans with an original principal amount of $2 million or greater will be asked to submit additional information to inform SBA's review of the borrowers' good-faith certifications that economic uncertainty made the PPP loan request necessary to support the borrowers' ongoing operations. To facilitate the collection of this supplementary information, SBA is seeking OMB approval of SBA Form 3509 - *Loan Necessity Questionnaire (For-Profit Borrowers)* and SBA Form 3510 - *Loan Necessity Questionnaire (Non-Profit Borrowers).*[28]

76.     The justification submitted to OMB further announced that "SBA may request additional information from the Lender or the borrower, if necessary, to complete the review. Such information may include a statement from the borrower identifying and explaining compelling circumstances that provide an adequate basis for its good faith certification." *Id*.

---

[27] Tom Temin, "GAO takes on auditing the auditing of how SBA handled PPP checks," Federal News Network, Oct. 14, 2020, https://federalnewsnetwork.com/agency-oversight/2020/10/what-gao-found-so-far-in-its-audit-of-auditing-how-sba-handled-ppp-checks/.

[28] OMB Justification (3245-0407), October 19, 2020 (available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202010-3245-005).

77.     SBA Form 3509 (for-profit companies) states that its "purpose . . . is to facilitate the collection of supplemental information that will be used by SBA loan reviewers to evaluate the good-faith certification that you made on your PPP Borrower Application (SBA Form 2483 or Lender's equivalent form) that economic uncertainty made the loan request necessary." Borrowers that received PPP loans with an original principal amount of $2 million or greater are required to complete the form and submit the required supporting documentation "to the Lender servicing your PPP loan within ten business days of receipt from your Lender."

78.     SBA further elaborated that it "is reviewing these loans to maximize program integrity and protect taxpayer resources. The information collected will be used to inform SBA's review of your good-faith certification that economic uncertainty made your loan request necessary to support your ongoing operations."

79.     The Form further states that:

Receipt of this form does not mean that SBA is challenging that certification. After this form is submitted, SBA may request additional information, if necessary, to complete the review. SBA's determination will be based on the totality of your circumstances.

Failure to complete the form and provide the required supporting documents may result in SBA's determination that you were ineligible for either the PPP loan, the PPP loan amount, or any forgiveness amount claimed, and SBA may seek repayment of the loan or pursue other available remedies.

Within five business days after you provide a complete form with all required responses, supporting documents, and signatures and certifications, the Lender servicing your loan is required to upload the form and documents to the SBA PPP Forgiveness Platform (forgiveness.sba.gov) and separately input your responses to each question into the web form available in the platform.

80.     SBA's filing with OMB provided the following rationale as to why the Questionnaire should not be published:

SBA's evaluation of a borrower's good-faith certification will be based on a **multi-factor analysis that considers the totality of the borrower's circumstances**. The questionnaires are tailored to a borrower's for-profit or non-

profit status. Given the importance of protecting the integrity of the SBA loan review program, **SBA requests that OMB not make the form publicly available at this time**. For example, the questionnaires seek information about a borrower's business practices after receiving a PPP loan that may bear upon the borrower's required certification. **Publicizing these questions could enable some borrowers to modify their business practices in an attempt to affect SBA's assessment of their certification**.

81.     On October 26, 2020, SBA published a notice and 30-day request for comment on its ongoing collection of information. Reporting and Recordkeeping Requirements Under OMB Review, 85 Fed. Reg. 67,809 ("October Notice"). In that notice, SBA stated that OMB's emergency approval expires on October 31, 2020, without mentioning the 180-day limit in the PRA, 44 U.S.C. § 3507(j). SBA further stated that it "is submitting the information collection to OMB for standard (non-emergency) review and approval to use the information collection beyond the emergency expiration date, October 31, 2020." *Id.* at 67,809-10.

82.     Although the October Notice refers to SBA's Questionnaire (Forms 3509 and 3510), neither questionnaire form was made available to commenters. Moreover, by then, SBA had *already begun circulating* the Questionnaire to lenders, with instructions that it be passed on to be completed by borrowers with PPP loans in excess of $2 million. Borrowers were given 10 business days to respond to the Questionnaire and provide information by which SBA would determine the necessity of the borrower's need for the PPP loan.

83.     On the same day that SBA published the October Notice seeking standard (non-emergency) approval of its ongoing information collection request from OMB, OMB quietly extended the expiration date of its emergency approval from October 31, 2020 to November 30, 2020. Neither the October Notice nor any of the Supporting Statements or Justifications related to SBA's ongoing information collection acknowledges, let alone justifies, that additional month extension. Upon information and belief, lenders are now sending Forms 3509 and 3510 to PPP borrowers that reflect this revised expiration date of November 30, 2020.

**VIII.   The Loan Necessity Questionnaire Focuses on the Wrong Period of Time to Evaluate PPP Loan and Loan Forgiveness Eligibility, and Is Unduly Burdensome.**

84.   Not only did SBA, with OMB's complicity, roll out the Questionnaire in secret, the substance of the Questionnaire goes far beyond the relevant business affairs of PPP loan borrowers about which SBA may legitimately inquire as part of its evaluation of those borrowers' eligibility for loan forgiveness and for the loan in the first instance. It also imposes an undue burden.

85.   As a general matter, the Questionnaire is flawed because it focuses on the wrong timeframe for evaluating a borrower's need for a PPP loan and the borrower's good-faith certification that economic uncertainty at the time of the application necessitated the business need for the loan. The questions posed and supporting documentation sought by the Questionnaire focus on the borrower's success or failure in the ensuing months of 2020, not on the environment and the borrower's contemporaneous understanding of the economic environment it faced at the time of loan application.

86.   For example, the Questionnaire asks:

  a.   for a comparison of second quarter 2020 revenue to the same period of 2019 (if applicable);

  b.   about whether any state or local shutdown orders have occurred during the pandemic;

  c.   about any cash outlays for any business alterations due to closures since March; and

  d.   for a detailed assessment of a borrower's financial standing since March through current bank statements and other data.

87.   These questions are misguided. At the time of application, the borrower was asked to certify in good faith that economic uncertainty made the loan necessary *at that time*. The CARES Act required that the borrower self-assess to the best of its ability with the

information it had *at that time*. Any circumstances that happened after the certification was made and throughout the pandemic should have no bearing on evaluating the borrower's good faith statement *at the time* it made the certification. Any questions regarding current liquidity information and revenue data during the weeks and months after the good-faith certification of necessity for the loan necessarily fall outside the scope of what any reasonable self-assessing borrower could have known at the time.

88.     Moreover, the CARES Act did not include a means-based test, revenue reduction test, liquidity test, or any other metric to assess financial standing in order to assign prioritization of PPP loans to certain borrowers over others, yet the Questionnaire probes into the personal finances of small business owners, even seeking exact dollar amounts of all cash on hand with supporting documentation. This is flatly contrary to the CARES Act itself. As quoted above (*supra* par. 23), Congress explicitly directed that the requirement in other SBA loan programs that the borrower be unable to obtain credit elsewhere shall not apply to PPP loans.

89.     The risk here to AGC members is that businesses that unexpectedly managed to survive and even remain profitable during the pandemic will be treated unfavorably by SBA in the loan forgiveness process because, in the very short run, they were able to withstand the economic uncertainty they faced. Answers to the Questionnaire will not tell the full story. PPP loan requirements directed PPP borrowers to use the majority of loan funds to keep employees on their payrolls, giving them the ability to direct other available liquidity or revenue to other aspects of the ongoing operations of their business. If a PPP borrower emerges from the pandemic reporting steady or increased revenue with healthy liquidity and continuing employment, for that borrower and its employees, the program was successful in meeting its goal

to help sustain the economy. That borrower should not be penalized for availing itself of the opportunity the PPP provided.

90.     Furthermore, questions in the Questionnaire that focus on whether closures or changes in operations were either mandatory or voluntary, and details on which governmental jurisdiction mandated the closures, do not correlate to a borrower's up-front attestation of need for a PPP loan, and may lead to a misinformed analysis by the agencies.

91.     More unfortunate still, the Questionnaire—in addition to probing far beyond the scope of what is relevant to the borrower's good-faith certification in the spring—does not provide an adequate opportunity for the borrower to provide an explanation or relevant context for the borrower's certification.

92.     And because it is overly expansive, the Questionnaire is also unduly burdensome. By its terms, lenders have five days from receipt of the Questionnaire and forwarding letter from SBA to notify borrowers of SBA's review process, and a borrower in turn has only 10 days from the receipt of the Questionnaire from its lender to complete it. The Questionnaire is then returned to the lender, which has five days to upload the borrower's answers to SBA's "PPP Forgiveness Platform" portal. The deadlines alone are not practicable, and certainly not reasonable. Furthermore, the 9-page Questionnaire demands a level and type of reporting never previously required from borrowers by statute or in any process in PPP lending, and for most borrowers its completion will take much longer than the 90 minutes estimated by SBA in the October 20, 2020, supporting statement it submitted to OMB requesting approval to add the Questionnaire to SBA's emergency collection of information (OMB Control Number 3245-0407).[29]

---

29 *See* https://www.reginfo.gov/public/do/DownloadDocument?objectID=105451401.

93.    Beyond that, the SBA forwarding letter to lenders describes additional documentation requirements, and directs lenders to provide written notice to borrowers requiring borrowers to submit documentation to the lender -- documentation that SBA's separately published PPP Loan Forgiveness Application (Form 3508 *et seq.*) characterizes as "Documentation that Each Borrower Must Maintain but is Not Required to Submit." SBA never gave advance notice that borrowers could be required to submit this extensive documentation.

## CLAIMS FOR RELIEF

**Count I: SBA's Loan Necessity Questionnaire is Arbitrary and Capricious and Contrary to the PRA.**

94.    Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

95.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A), (C), (D).

96.    SBA's Questionnaire is arbitrary and capricious.

97.    As explained above, through the Questionnaire, SBA intends to evaluate the good-faith certifications that borrowers of PPP loans of $2 million or more made regarding the business necessity for the loans in light of the economic uncertainty at the time they applied for the loans. Nobody, including AGC or its members, disputes that SBA may do that under its CARES Act authority. But in carrying out that function, SBA must—as any agency must when carrying out any authorized function—do so in a manner consistent with its authorized objective.

98.     Relevant here, SBA's statutorily authorized objective is to evaluate whether borrowers had a good-faith basis *at the time of application* to attest that economic uncertainty made their applications for PPP loans necessary in order to carry out their ongoing business operations. Thus, in order to evaluate any such certifications, the focus of SBA's inquiry must remain on the circumstances *at the time of application*.

99.     The Questionnaire goes far beyond the relevant temporal scope, seeking information and supporting documentation about circumstances that transpired after the applications had been submitted and loan money disbursed.

100.    Compounding the error, the Questionnaire does not provide sufficient opportunity for borrowers to provide relevant supplemental information that would, at the very least, allow borrowers to explain later circumstances as helpful context for SBA. In other words, although the Questionnaire tells borrowers that "SBA's determination will be based on the totality of your circumstances," the Questionnaire does not actually allow the borrower to present the totality.

101.    Because the Questionnaire poses questions and seeks documentation for a different period of time than that about which PPP loan borrowers were asked when, as part of their loan applications, they certified that economic uncertainty made their PPP loans necessary to their ongoing business operations, and because the Questionnaire does not otherwise permit borrowers to explain the totality of their circumstances, the Questionnaire is inherently arbitrary and capricious.

102.    Furthermore, SBA improperly relied on the PRA's emergency approval process (44 U.S.C. § 3507(j)) to add the Questionnaire to a previously approved collection of information and for a period that exceeded the statutorily mandated maximum of 180 days. That addition constituted a substantive or material modification. SBA undertook these actions without

following the PRA's notice-and-comment procedures. *See id.* §§ 3506(c)(2), 3507(b)-(c). In so

doing, SBA acted in excess of its authority under the PRA and without observance of procedure

required by the PRA in violation of the APA, 5 U.S.C. § 706(2)(D).

**Count II: OMB's Approval of Changes to SBA's Emergency Information Collection Request Violates the APA and Paperwork Reduction Act.**

103.    Plaintiff re-alleges and incorporates by reference the allegations of the preceding

paragraphs.

104.    The APA requires that a reviewing court "hold unlawful and set aside agency

action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right;" or "without observance of procedure required by law[.]"

5 U.S.C. § 706(2)(A), (C), (D).

105.    OMB failed to provide a reasoned basis for its decision to approve, on an

emergency basis, the addition of the Questionnaire (Forms 3509 and 3510) to SBA's previously

approved information collection request. Far from being "no[t] material" or "nonsubstantive"

changes to SBA's information collection request, these forms introduce new concepts, change

the scope of SBA's inquiries, and reinterpret prior SBA guidance. OMB's approval is thus

arbitrary, capricious, and otherwise contrary to law in violation of the APA, 5 U.S.C. §

706(2)(A).

106.    By approving the addition of Forms 3509 and 3510 to SBA's information

collection on an emergency basis, OMB also ignored the PRA's procedural requirements

governing notice and comment. *See* 44 U.S.C. §§ 3506(c)(2), 3507(b)-(c). In so doing, OMB

acted without observance of procedure required by law in violation of the APA, 5 U.S.C. §

706(2)(D).

107.     OMB's extension of the expiration date for its emergency approval of SBA's information collection request—from October 31, 2020 to November 30, 2020—lacked any justification, much less a reasonable one. Therefore, that extension is arbitrary, capricious, and otherwise contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A). Moreover, OMB's extension runs contrary to the PRA, which limits the collection of information conducted on an emergency basis and without compliance with the PRA's procedural safeguards to "a maximum of 180 days," *i.e.*, until (at the latest) September 26, 2020. 44 U.S.C. § 3507(j). Although the PRA grants OMB authority to approve extensions of currently approved information collections in 44 U.S.C. § 3507(h), the 30-day extension OMB granted to SBA fails to satisfy the statutory requirements. Accordingly, OMB's decision to approve the expiration date is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law" in violation of the APA, 5 U.S.C. §§ 706(2)(C), (D).

**Count III: SBA Is Violating PPP Borrowers' Due Process Rights.**

108.     Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

109.     The Fifth Amendment to the U.S. Constitution provides that parties must be afforded due process of law prior to being deprived of their property or liberty interest.

110.     An important aspect of due process is that parties subject to regulation and penalties for non-compliance have the fundamental right to know what the government expects of them, and that a certain irreducible level of clarity in a statute or regulation is necessary, both to allow the regulated to conform their conduct and to safeguard them from the government applying the law in an arbitrary or discriminatory way.

111.     As described in the paragraphs above, at the time PPP borrowers applied for PPP loans, the CARES Act and the SBA application form required those borrowers to certify that "current economic uncertainty [made] this loan request necessary to support ongoing operations." Neither Congress, nor SBA, nor any government office, had provided applicants with any consistent or actionable guidance as to the meaning of the terms "economic uncertainty" or "ongoing operations," or what SBA deemed "necessary to support" such operations.

112.     To the best of AGC's knowledge, information and belief, AGC member borrowers made their certifications in good faith, based on the "current" economic uncertainty that they faced in April 2020. Given the vagueness of the relevant terms used in the CARES Act and carried forward into the PPP loan application, no reasonable borrower—certainly not without any guidance from Congress or the SBA—could have anticipated at the time of the loan application in April that by "*current* economic uncertainty" the federal government intended to condition PPP loans, or the forgiveness of those loans, on subsequent developments over the course of 2020.

113.     On information and belief, AGC member borrowers made business decisions after making their certifications with the understanding that, to the extent the government would audit a loan application, the audit would be based on documentation and statements informing or describing the borrower's economic circumstances, and the borrower's understanding of the economic uncertainty, at the time the borrower applied for the PPP loan.

114.     Yet now, in the Questionnaire, SBA seeks to assess the necessity of the loans and the validity of the borrower's certification by examining myriad facts that developed only after

the certification was made, such as second quarter 2020 revenue and financial standing since April 2020.

115.    To the extent SBA uses the Questionnaire to deny an AGC member borrower's application for PPP loan forgiveness, or to take some other adverse action with respect to any such loan, because of circumstances that developed only after the borrower made its certification, SBA violates that AGC member's right of due process because the terms of the certification contained in the PPP loan application were unconstitutionally vague.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a.    Declare that the Questionnaire was developed and published through unlawful process and in excess of statutory authority;

b.    Declare that the Questionnaire is, in substance, arbitrary and capricious;

c.    Declare that SBA's use of the Questionnaire to deny an AGC member borrower's application for PPP loan forgiveness, or to take some other adverse action with respect to any such loan, because of circumstances that developed only after the borrower made its certification, denies that AGC member due process;

d.    Permanently enjoin SBA from basing a decision to deny an application for PPP loan forgiveness, or challenging a borrower's certification that economic uncertainty made his or her requests necessary to support ongoing operations, solely or exclusively on the information that a borrower provides to SBA in response to the Questionnaire;

e.    Permanently enjoin SBA from challenging such a certification in the absence of a finding that the borrower did not act in good faith at the time when he or she made the certification;

f.    Order SBA to make the Questionnaire available for public comment for at least 60 days;

g.  Order SBA to adopt—following its consideration of the comments received and its incorporation of any new language based on those comments, and subject to OMB approval—a revised questionnaire for prospective use in evaluating PPP loan and loan forgiveness eligibility that is consistent with reasoned decision-making and due process and which permits, *inter alia*, borrowers to explain the totality of their circumstances as much as reasonably necessary; and

h.  Award AGC such other relief as this Court deems appropriate.

Respectfully submitted,

December 9, 2020

*/s/ Daniel W. Wolff*
Daniel W. Wolff (D.C. Bar #486733)
David Y. Chung (D.C. Bar #500420)
Amy L. O'Sullivan (D.C. Bar #474973)
Olivia L. Lynch (D.C. Bar #1011623)
Michael E. Samuels (D.C. Bar #1030652)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2595
Phone: 202-624-2500
Fax: 202-628-5116

*Attorneys for Plaintiff Associated General Contractors of America, Inc.*